**Appeal No. 16-1900**

---

**IN THE**
**United States Court of Appeals**
**FOR THE FEDERAL CIRCUIT**

---

NIDEC MOTOR CORPORATION

*Appellant,*

*v.*

ZHONGSHAN BROAD OCEAN MOTOR CO., LTD.,
BROAD OCEAN MOTOR LLC, and
BROAD OCEAN TECHNOLOGIES, LLC,

*Appellees.*

---

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD, IPR2014-01122,
Benjamin D.M. Wood, James A. Tartal, and Patrick M. Boucher,
Administrative Patent Judges

---

# CORRECTED BRIEF OF APPELLEES

---

Steven F. Meyer
Joseph A. Farco
LOCKE LORD LLP
Three World Financial Center
Brookfield Place, 200 Vesey Street
New York, NY 10281

Charles S. Baker
LOCKE LORD LLP
600 Travis Street
2800 JP Morgan Chase Tower
Houston, TX 77002-3095

*Counsel for Appellees*
*ZHONGSHAN BROAD OCEAN MOTOR CO. LTD.*
*BROAD OCEAN MOTOR LLC, and*
*BROAD OCEAN TECHNOLOGIES, LLC*

Dated: August 23, 2016

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**NIDEC MOTOR CORPORATION v. ZHONGSHAN BROAD OCEAN MOTOR CO., LTD.; BROAD OCEAN MOTOR, LLC; and BROAD OCEAN TECHNOLOGIES, LLC**

**Appeal No. 16-1900**

# CERTIFICATE OF INTEREST

Counsel for the Appellees Zhongshan Broad Ocean Motor Co., Ltd.; Broad Ocean Motor, LLC; and Broad Ocean Technologies, LLC certifies the following (use “None” if applicable; use extra sheets if necessary):

1. The full name of every party represented by me is:

Zhongshan Broad Ocean Motor Co. Ltd.
Broad Ocean Motor, LLC
Broad Ocean Technologies, LLC

2. The name of each real party in interest represented by me is:

Zhongshan Broad Ocean Motor Co. Ltd.
Broad Ocean Motor, LLC
Broad Ocean Technologies, LLC

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Zhongshan Broad Ocean Motor Co. Ltd. is the parent company of Broad Ocean Motor LLC and Broad Ocean Technology, LLC. No publicly held company owns ten percent or more of the named Appellees.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

Daniel G. Nguyen
LOCKE LORD LLP
2800 JPMorgan Chase Tower
600 Travis Street, Suite 2800
Houston, Texas 77002
(713) 226-1200

Nathan J. Rees
Daniel A. Prati
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
(214) 855-7164

Dated: August 23, 2016

***/s/ Steven F. Meyer***

Steven F. Meyer, Esq.
LOCKE LORD LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281

*Attorneys for Appellees Zhongshan Broad Ocean Motor Co., Broad Ocean Motor, LLC and Broad Ocean Technologies, LLC*

# TABLE OF CONTENTS

**Page**


Table of Authorities ..... iii

Statement of Related Cases ..... vi

Preliminary Statement ..... 1

Jurisdictional Statement ..... 5

Statement of the Issues ..... 6

Statement of the Case ..... 7

Statement of Facts ..... 10

I. STATEMENT OF FACTS ..... 10

A. Rotating Frame of Reference: d-axis and Q-axis ..... 10

B. The Uncontested Claim Constructions By The Board ..... 15

C. Disclosure Of The '895 Patent Specification ..... 17

D. Disclosure of Kusaka ..... 24

Summary of the Argument ..... 27

Argument ..... 30

A. Appellant Has Not Shown That The Board Erred In Construing The "Combining" Claim Term ..... 30

B. Appellant Has Not Shown That The Board Erred In Concluding That Claim 21 Is Anticipated By Kusaka Under *Kennametal* ..... 46

1. The Board Did Not Change Theories In Midstream ..... 48

2. The Board Properly Relied Upon Dr. Blank's Declaration In Concluding That Kusaka Discloses the "Combining the IQr Demand and the dr-axis Injection Demand to Produce an IQdr Demand…" Limitation Under *Kennametal* ..... 52

C. The Board's Judgment That Claim 21 Is Invalid Can Be Affirmed On The Alternative Ground That Kusaka Inherently Discloses The "Combining" .......................62

Conclusion ..........................................................................................................67

Certificate of Service ..........................................................................................68

Certificate of Compliance ....................................................................................69

# TABLE OF AUTHORITIES

**Cases**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
707 F.3d 1318 (Fed. Cir. 2013) ....................................................................27

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ....................................................................53

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) .......................................................... 28, 58, 60

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008) ......................................................................46

*Conoco, Inc. v. Energy & Envtl., Int'l, L.C.*,
460 F.3d 1349 (Fed. Cir. 2006) ....................................................................31

*Cuozzo Speed Techs., LLC v. Lee*,
136 S. Ct. 1231 (2016)...................................................................................31

*Datascope Corp. v. SMEC, Inc.*,
879 F.2d 820 (Fed. Cir. 1989) .................................................................. 29, 63

*Gart v. Logitech, Inc.*, 254 F.3d 1334 (Fed. Cir. 2001).........................................36

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
383 F.3d 1352 (Fed. Cir. 2004) ............................................................ 37, 38, 39

*Genzyme Therapeutic Prods. LP v. Biomarin Pharm. Inc.*,
____ F.3d ____, 2016 WL 3254734, at *4
(Fed. Cir. June 14, 2016) ....................................................................... 48, 57

*Guttman, Inc. v. Kopykake Enters., Inc.*,
302 F.3d 1352 (Fed. Cir. 2002) ....................................................................31

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ....................................................................47

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) ........................................................................31

*In re King*, 801 F.2d 1324 (Fed. Cir. 1986) ...............................................................65

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
780 F.3d 1376 (Fed. Cir. 2015) ..................................................................... passim

*Phillips v. AWH Corp.*, 415 F.3d 1303
(Fed. Cir. 2005) (*en banc*) ........................................................................ 27, 37, 39

*Pyles v. Merit Sys. Prot. Bd.*, 45 F.3d 411 (Fed. Cir. 1995) ....................................36

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ..........................................................................66

*Shaw Indus. Group, Inc. v. Automated Creel Sys., Inc.*,
817 F.3d 1293 (Fed. Cir. 2016) ..........................................................................66

*Space Sys./Loral, Inc. v. Lockheed Martin Corp.*,
405 F.3d 985 (Fed. Cir. 2005) ............................................................................32

*Stewart-Warner Corp. v. U.S.*, 748 F.2d 663 (Fed. Cir. 1984)................................36

*Wi-LAN USA, Inc. v. Apple Inc.*,
____ F.3d ____, 2016 WL 4073324, at *7
(Fed. Cir. Aug. 1, 2016) ...........................................................................................31

**<u>Rules</u>**

Fed. R. Evid. 201(b)(2) .............................................................................................35

**<u>Regulations</u>**

37 C.F.R. §42.104(b) ...................................................................................................7

37 C.F.R. §42.62(a)......................................................................................................35

**Other Authorities**

http://www.merriam-webster.com/dictionary/combine.............................. 37, 38, 39

*Webster's Third New International Dictionary* 452 (1993)........................................................................................................ passim

http://www.wikihow.com/convert-radians-to-degrees ..........................................49

## STATEMENT OF RELATED CASES

Appellant Nidec Motor Corporation ("Appellant") sued Appellees Zhongshan Broad Ocean Motor Co., Ltd., Broad Ocean Motor LLC and Broad Ocean Technologies, LLC (collectively, "Appellees") for infringement of, inter alia, U.S. Patent Nos. 7,208,895 ("the '895 patent") and 7,626,349 ("the '349 patent") in *Nidec Motor Corporation v. Broad Ocean Motor LLC, et al.*, Civil Action No. 4:13-cv-01895-JCH in the United States District Court for the Eastern District of Missouri.

Appellees filed a Petition for *Inter Partes* Review of claims 9 and 21 of the '895 patent, IPR2014-01122. The Board's Final Written Decision invalidating claims 9 and 21 of the '895 patent (see Appx0007-0025) is the subject of this appeal, Appeal No. 2016-1900.

Appellees also filed two petitions for *Inter Partes* Review of claims 1, 2, 3, 8, 9, 12, 16 and 19 of the '349 patent, IPR2014-01121 and IPR2015-00762, which were joined. The Board's Final Written Decision invalidating claims 1, 2, 3, 8, 9, 12, 16 and 19 is the subject of Appeal No. 2016-2321, now pending before this Court.

## PRELIMINARY STATEMENT

The Board determined that claim 21 of U.S. Patent No. 7,208,895 ("the '895 patent") is anticipated by Kusaka U.S. Patent No. 5,569,995 ("Kusaka"). Claim 21 of the '895 patent recites "[a] permanent magnet rotating machine and controller assembly configured to perform the method of claim 12." See Appx0039. Claim 12, in turn, recites an algorithm used by the controller when performing vector control to determine the electrical voltages to be supplied to the windings of the permanent magnet rotating machine's stator. The only limitation at issue in this appeal is the "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand that is compensated for any torque contribution of dr-axis current" limitation recited in claim 12.

While the underlying technology for controlling electrical currents and voltages within a permanent magnet electric motor may seem overly complicated and theoretical, the factual and legal issues before this Court are relatively straightforward.

Kusaka discloses a method and apparatus for driving and controlling a permanent magnet motor using vector control. The parties' dispute regarding Kusaka centers on the operation of the Current Control Section 18 which is highlighted in yellow in the below reproduced Figure 1 of Kusaka.




**Fig. 1**

Power conversion in the Inverter 12 is vector-controlled by a Current Condition Computing Section 16 and a Current Control Section 18. See Appx0578 at col. 11, ln. 53-55. As depicted in Figure 1, the Current Control Section 18 converts inputted Id*, Iq* and Θ values into the outputted three phase current Iu*, Iv* and Iw* values. It is this conversion performed by the Current Control Section 18 that was at issue below before the Board and now here on appeal.

The Board found that Kusaka's "set of Iu*, Iv*, and Iw* is an IQdr demand as we have construed the term". Appx0019. Appellant has not challenged the Board's construction of the "IQdr demand" claim term or this factual finding. See Appellant's Br. 2 ("Issues Presented For Review"). Under its construction of the "combining" claim term to mean "intermixing", the Board held that under *Kennametal*, Kusaka anticipates because the set of Iu*, Iv* and Iw*, which is an

IQdr demand, is produced as a result of combining Kusaka's Id* and Iq* signals, in view of a set of equations presented in the declaration by Appellant's expert Dr. Blank. See Appx0019-0021. In his declaration, Dr. Blank identified the following set of equations that could be used by Kusaka's Current Control Section 18:

> 27. Similarly, a typical transform from the d-q frame of reference to the abc (uvw) frame of reference is shown below:
>
> $$Ia = Id \cos \Theta - Iq \sin \Theta$$
>
> $$Ib = Id \cos (\Theta - 2\pi/3) - Iq \sin (\Theta - 2\pi/3)$$
>
> $$Ic = Id \cos (\Theta + 2\pi/3) - Iq \sin (\Theta + 2\pi/3)$$

See Appx1092-1093 at ¶¶26-27. Quite simply, the Board found that the set of Ia, Ib and Ic values (i.e., the IQdr demand) was produced by combining Id and Iq values because, for each of the Ia, Ib and Ic equations reproduced above, *both* Id and Iq appear in each equation. See Appx0019-0020.

The Board did not err in construing the "combining" claim term under the broadest reasonable interpretation ("BRI") standard to mean "intermixing", which is a dictionary meaning of that term. The set of equations presented by Dr. Blank in his declaration, along with Kusaka itself, constitutes substantial evidence of anticipation by Kusaka under *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,

780 F.3d 1376 (Fed. Cir. 2015). Alternatively, the set of equations presented by Dr. Blank in his declaration, along with an admission made by Appellant at the Oral Hearing that there are no other equations falling outside the scope of the "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand" limitation, establish that Kusaka inherently discloses that limitation.

## JURISDICTIONAL STATEMENT

Appellees do not disagree with Appellant's Statement of Jurisdiction.

## STATEMENT OF THE ISSUES

1. Did the Board err in construing the "combining" claim term, under the BRI standard, to mean "intermixing", which is a dictionary meaning, in the admitted absence of any relevant intrinsic evidence?

2. Does the set of equations presented in Dr. Blank's declaration, along with Kusaka itself, constitute substantial evidence supporting the Board's judgment that claim 21 of the '895 patent is anticipated by Kusaka?

## STATEMENT OF THE CASE

On July 3, 2014, Appellees timely filed a petition for *inter partes* review of claims 9 and 21 of the '895 patent. On July 25, 2014, the Board objected to the claim charts included as part of the originally filed petition. See Appx0094-0095. In response, Appellees filed a Corrected Petition. See Appx0102-0151.

The Corrected Petition presented four grounds of challenge pursuant to 37 C.F.R. §42.104(b). Ground 1 sought the invalidation of claim 9 of the '895 patent under 35 U.S.C. §102(b) based on Hiroyuki Japanese Patent Publication No. 11-155202. Ground 2 sought the invalidation of claim 9 under §102(b) based on Chen et al. U.S. Patent No. 6,498,449 ("Chen"). Ground 3 sought the invalidation of claim 21 under §102(b) based on Kusaka et al. U.S. Patent No. 5,569,995 ("Kusaka"). Ground 4 sought the invalidation of claim 21 under §102(b) based on Walters et al. U.S. Patent No. 6,407,531 ("Walters"). See Appx0106-0107.

On October 24, 2014, Appellant filed its Preliminary Response. See Appx0174-94. Appellant's Preliminary Response addressed Grounds 1 and 2, but failed to address Grounds 3 and 4 at all. See Appx0183-0193.

The Board instituted an *inter partes* review trial on Grounds 2-4, but denied institution on Ground 1. See Appx0241-0242. The Board construed certain claim terms and recited in independent claims 1 and 12 of the '895 patent, including the

"IQr demand," "dr-axis injection current demand," and "IQdr demand" claim terms recited in claim 12. See Appx0227-0230. The Board saw "no reason to modify those constructions in light of development of the parties' positions during trial, and adopt[ed] them" in its later issued Final Written Decision. See Appx0013-14. Here, the Appellant is not challenging those claim constructions on appeal. In its initial Decision (Institution of Inter Partes Review), the Board did not construe the word "combining" recited in claim 12 because neither party requested the Board to do so. See Appx0227-0230.

On January 12, 2016, the Board issued its Final Written Decision. See Appx0007-0025.

With respect to claim 9, the Board rejected Appellant's attempt to further narrow the Board's earlier construction of the "scaled torque demand" claim term. See Appx0016. The Board then "conclude[d] that [Appellees] have demonstrated, by a preponderance of the evidence, that claim 9 is anticipated by Chen." See Appx0017. Appellant is not challenging the Board's conclusion that claim 9 is anticipated by Chen. See Appellant's Br. 2 & 14.

With respect to dependent claim 21, in the Final Written Decision, the Board construed the "combining" claim term in the "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand" limitation recited in independent claim 12 in accordance with a dictionary definition to require an

intermixing of the IQr demand and dr-axis injection current demand signals. See Appx0019-0021. Based on this construction of the "combining" claim term, the Board concluded that claim 21 is anticipated by Kusaka, but not by Walters. See Appx0020-0024.

Appellant did not file a request for rehearing of the Board's Final Written Decision. See 37 C.F.R. §42.71(d).

Here, on appeal, Appellant's challenge to the Board's claim constructions is limited to the "combining" claim term only. See Appellant Br. 2 ("Issues Presented For Review"). Appellant also challenges the Board's final judgment that claim 21 is anticipated under §102(b) on the ground that Kusaka does not expressly or inherently disclose that its Id* and Iq* signals are combined by its Current Control Section 18. See Appellant's Br. 2.

# STATEMENT OF FACTS

## I. STATEMENT OF FACTS

### A. Rotating Frame of Reference: d-axis and Q-axis

Figure 1 of the '895 patent, which is reproduced below, depicts a permanent magnet ("PM") electric motor 101 that comprises an inner rotor 104 that rotates within a stationary stator 102, around which energizable phase windings 106A, 106B and 106C are wound [Appx0035 at col. 2, ln. 14-22].




FIG. 1

For such an electric motor, there are two alternative frames of reference that the controller 110 uses for assessing the electric current ("I") and voltage ("V"): the stationary abc (uvw) frame of reference and the rotating d-q frame of reference. A value for the current I that is measured in the stationary abc (uvw) frame of reference can be transformed to the rotating d-q frame of reference by a set of known equations. See Appx1092-1093 at ¶26. Similarly, a value for the current I

in the rotating d-q frame of reference can be transformed to the stationary abc (uvw) frame of reference by a set of known equations. See Appx1093 at ¶27.

Claim 12 of the '895 patent recites "an IQr demand" and "a dr-axis injection current demand". Appx0039. While not expressly recited in claim 12, these parameters are recognized as being in the rotating d-q frame of reference. See Appx0010-0011 & 0014; Appx0670 at ¶¶46-47.

The control scheme employed within the controller 110 to control the PM motor 101 relies on "vector control". See Appellant's Br. at p. 8. Appellees' expert, Dr. Ehsani, explained that this vector control uses the rotating frame of reference.[1] "The rotating frame simplifies the mathematical representation of the motor control and allows for precise control of the motor." Appx0656 at ¶12.

"The concept of vector control, which typically uses d and [Q] current components, arises from [a] principle [in which] torque arrives from the interaction of two magnetic fields, one originating from the stator and one originating from the rotor." Appx0657 at ¶13. Under ideal conditions, these two magnetic fields are orthogonal with each other. See Id. "Under these conditions one of these fields is

---

[1] Appellant's expert, Dr. Blank, testified that he did not dispute the technical accuracy of Dr. Ehsani's testimony about vector control and the rotating frame of reference. See Appx1078 at ¶9.

designed and designated to be the magnetizing field, with its associated flux, (i.e., the direct, or 'd,' axis field and flux). The other field, and its associated flux, is designed and designated to be the armature field and flux (quadrature, or '[Q],' axis field and flux)." See Id.

The illustration from Dr. Ehsani's Declaration is reproduced below:




Appx0658. This drawing shows a rotor, which has a permanent magnet having north and south poles $N_r$ and $S_r$, respectively, and a stator, which includes electromagnets that result in a virtual stator magnet having north and south poles

$N_s$ and $S_s$, respectively. See Appx0658 at ¶15. The d-axis is aligned with the rotor and the Q-axis[2] is offset 90° from the d-axis. See Id. at ¶16.

The d-axis flux, and the current that produces it (i.e., Id), serve to "magnetize" the motor. The quadrature axis flux, and the current that produces it (i.e., Iq) serve to produce torque in the motor. Ideally, Id and Iq are also independent of each other. Therefore, in motor drive control, these two component currents are computed separately and for different purposes. The Id is produced from considerations of the desired motor magnetization, speed, back emf, and the available voltage from the supply (e.g., dc bus voltage of the drive power converter). The Iq is produced from considerations of the desired (i.e., "demanded") motor torque, specified magnetization flux, and imperfections of the motor. See Appx0659 at ¶17.

In an ideal motor, Id is assumed to be zero. See Appx1074 at col. 6, ln. 1-7; Appx0660 at ¶18; Appx0807 at ln. 11-16. "Although in many situations it is preferable to maintain the d-axis current to zero (as it may not contribute to

---

[2] Both Dr. Ehsani and Appellant's expert, Dr. Blank, used a lower case letter q to refer to this axis. See Appx0657-0661 at ¶¶13-20; Appx1092-1093 at ¶¶26-28. The Board used an upper-case letter Q for consistency with claim 12 of the '895 patent. See Appx0011 at n.1.

torque), in some case it is beneficial to have a non-zero d-axis current. For example, as the rotor turns, it creates a back electromotive force ('back-emf'), which is a voltage, on the stator windings. That back-emf limits the amount of current that can be fed into the windings given a particular power supply voltage. However, by using a non-zero d-axis current, the back emf can be reduced, which is called field-weakening. By weakening the field, more current can be fed to the windings as the motor turns quickly, which allows the output torque to remain high at high speeds." Appx0660 at ¶19.

"The exact method of d and q axes current computations and implementation may include detailed mathematical manipulations, such as transformations from stationary to rotating frames of reference and back, and two phase to three phase transformation." See Appx0661 at ¶20; see also Appellant's Br. at p. 9 ("The motor commutates the three phase winding currents in the stationary frame of reference to maintain orthogonality of the d and Q axes as the rotor turns.").

Just to be clear, the patentee did not invent vector control, the rotating frame of reference or the equations to transform parameters from stationary to rotating frames of reference and back. See Appx0656 at ¶12; Appx1078 at ¶9; Appx1092-1093 at ¶¶26-27.

### B. The Uncontested Claim Constructions By The Board

Claim 12 of the '895 patent recites calculating an "IQr demand" from a speed or torque demand, calculating a "dr-axis injection current demand" as a function of a speed of the rotor, and combining the "IQr demand" and the "dr-axis injection current demand" to produce an "IQdr demand" that is compensated for any torque contribution of dr-axis current. Appx0039. Appellees' proposed constructions for the terms "IQr demand," "dr-axis injection current demand," and "IQdr demand" were supported by the direct testimony of its expert, Dr. Ehsani. See Appx0670-0671 at ¶¶46-48. Below, Appellant neither opposed Appellees' proposed constructions nor offered its own constructions for these claim terms. See Appx0230. The Board adopted Appellees' proposed constructions for these claim terms. See Appx0230; Appx0013-0014.

More specifically, Dr. Ehsani explained the "[a]n IQr demand is the current demand (or commanded current) for the q-axis using a rotating frame of reference. For example, given a particular torque demand, the control system will calculate a q-axis current demand that corresponds to the demanded torque." See Appx0670 at ¶46. The Board construed the "IQr demand" claim term to mean a "Q-axis demand current". See Appx0230; Appx0013-0014. Appellant is not challenging the Board's construction of the "IQr demand" claim term here.

Dr. Ehsani also explained that "[a] dr-axis injection current demand is the current demand (or command) for the d-axis using a rotating frame of reference." See Appx670 at ¶47. The Board construed the "dr-axis injection current demand" claim term to mean a "d-axis injection current". See Appx0230; Appx0013-0014. Appellant is not challenging the Board's construction of the "dr-axis injection current demand" claim term here.

Lastly, Dr. Ehsani explained that "[t]o apply the q-axis current command and the d-axis current command to the motor, the two must first be combined and then converted to the stationary frame of reference, which dictates how the windings of the PM Motor should be energized to create the requested torque. The IQdr demand is therefore a command that includes both q- and d-axis current commands." Appx0670-0671 at ¶48. The Board construed the "IQdr demand" claim term to mean "a current demand that includes Q- and d-axis current demands." See Appx0230; Appx0013-0014. Appellant is not challenging the Board's construction of the "IQdr demand" claim term here. Indeed, Appellant's expert, Dr. Blank, testified that "IQdr" is a general reference to Iq and Id. See Appx0807 at ln. 7-10.

In its initial Decision (Institution of Inter Partes Review), the Board did not construe the "combining" term recited in claim 12 because neither party requested the Board to do so. See Appx0227-0230.

### C. Disclosure Of The '895 Patent Specification

"The specification of the '895 patent does not expressly define the parameters 'IQr demand' and 'Idr demand'." See Appellant's Br. at p. 9. However, the '895 patent specification does describe how the IQr demand and Idr demand are calculated in the rotating frame of reference, and used to ultimately generate voltages 226 in the stationary frame of reference that energize the three phase windings 106A, 106B, and 106C of the PM motor 101.

Figure 2 of the '895 patent, which is reproduced below with highlighting, illustrates additional details of the PM motor system (and primarily the controller) depicted in Figure 1 which was reproduced supra [Appx0035 at col. 2, ln. 63-64].




FIG. 2

Appx0028

As shown in yellow highlighting in the above-reproduced Figure 2, the value of the Idr demand 209 (i.e., dr-axis injection current) is calculated by the Idr Injection block 210 using the value of the DC link voltage, vdc, and the estimated electrical speed 216. See Appx0036 at col. 3, ln. 4-10. This calculated Idr demand 209 signal is fed to the Torque to Iqdr Map block 206 and to the vectorize block 212.

A scaled torque demand signal 204 is input to the Torque to Iqdr Map block 206 (highlighted in green) that calculates an IQr demand using motor-specific torque-to-IQr map data. See Appx0035-0036 at col. 2, ln. 64 - col. 3, ln. 3. This calculated IQr demand 208 signal is also fed to the vectorize block 212.

The IQr demand is then "concatenated with" the Idr demand into a vector quantity IQdr demand 214 by the vectorize block 212, which is highlighted in orange. See Appx0036 at col. 3, ln. 3-6. Figure 4 of the '895 patent, which is reproduced below with corresponding highlighting, "shows an exemplary embodiment of the Idr Injection block 210, the Torque to IQdr Map block 206, and the vectorize block 212 of FIG. 2." [See Appx0036 at col. 4, ln. 65-67].




FIG. 4

Appx0030

As depicted in Figure 2 of the ‘895 patent, which is reproduced below with highlighting, this IQdr demand signal is fed to the Iqr Current Controller 218 and the Idr Current Controller 220, along with the IQdr actual signal and the estimated electric speed signal.




FIG. 2

The IQr Current Controller 218 (highlighted in purple) uses the IQdr demand signal 214 to convert the IQr demand in the rotating frame of reference to a voltage ("V") signal for the Q-axis of the rotating frame of reference -- the VQr signal. Similarly, the Idr Current Controller 220 (highlighted in blue) uses the IQdr demand signal 214 to convert the Idr demand in the rotating frame of reference to a separate voltage ("V") signal for the d-axis of the rotating frame of reference -- the Vdr signal. See Appx0036 at col. 3, ln. 14-19.

During the Oral Hearing, Appellant explained that the IQr demand signal and the Idr demand signal can be separated out of the "concatenated" IQdr demand signal by the IQr Current Controller 218 and the Idr Current Controller 220.

> JUDGE BOUCHER: Actually before you go on, I just want to make sure I understand this correctly, because subsequent to that in this drawing there are lines that go to the IQr Current Controller 218 and the Idr Current Controller 220.
>
> So is it correct that the individual IQr demand and Idr demands in the IQdr demand are independently recognizable?
>
> MR. BROWN: Well, I think in the case of the '895 embodiment we're talking about a vector. So if it is a vector it is going to have a direction and a quantity. And then the blocks 218 and 220 can take that vector quantity and determine the components of it that would be Iq and Id.
>
> Those are, in the rotating frame of reference, those are orthogonal signals, so you can decompose that vector

> within those two separate blocks to determine how much
> of it is Iq and how much of it is Id.

Appx0415-0416.

As further depicted in Figure 2 of the ‘895 patent, which is reproduced below with highlighting, the separate VQr and Vdr signals in the rotating frame of reference are transformed to three stationary frame of reference voltage signals 226 that are applied to the motor terminals to produce the demanded torque output, by the Frame Of Reference Transform block 222 and the Drive 108. [See Appx0036 at col. 3, ln. 16-25].

Appx0028



FIG. 2

Additionally, the '895 patent specification incorporates by reference the entirety of "co-pending U.S. Application Ser. No. 11/293,744" which later issued as U.S. Patent No. 7,342,379 ("the '379 patent," Appx1057-1075). See Appx0035 at col. 2, ln. 33-38. Figure 9 of the '379 patent, which is reproduced below with highlighting, depicts a Torque to IQdr Map block 904 and an Idr injection block 906 [Appx1074 at col. 5, ln. 51-53).




Appx1067

FIG. 9

The IQr demand signal and Idr demand signal are "multiplexed" to produce the IQdr demand signal. See Appx1074 at col. 5, ln. 53-57. Appellant's expert, Dr. Blank, explained that the output on the IQdr demand line 908 switches between the IQr demand input signal and the Idr demand input signal. See Appx0856-0857. That is, the IQdr demand signal comprises an interleaving of the IQr demand signals and the Idr demand signals.

According to Appellant's expert, Dr. Blank, multiplexing is not vectorizing. See Appx0857.

### D. Disclosure of Kusaka

Kusaka discloses a method and apparatus for driving and controlling a permanent magnet motor, including execution of "field weakening" by including a d-axis current in addition to a Q-axis current when the motor turns at high speeds. See Appx0573 at col. 1, ln. 9-17; Appx0578-0579 at col. 12, ln. 51 - col. 14, ln. 17. In some motors, the d-axis current used for field weakening may produce a torque, in which case compensation is made for that contribution on the Q-axis current. See Appx0580 at col. 18, ln. 45-58.

Figure 1 of Kusaka, which is reproduced below, is "a block diagram showing the system constitution of an electric vehicle to which each embodiment of the present invention is suitable" [Appx0577 at col. 10, ln. 38-40].




Fig. 1

"The system shown in FIG. 1 is an electric vehicle drive system and its controller …. [T]he electric discharge output of battery 10 is converted from DC to 3-phase AC by an inverter 12 and fed to a PM motor 14." See Appx0578 at col. 11, ln. 48-52. Power conversion in the inverter 12 is vector-controlled by a Current Condition Computing Section 16 and a Current Control Section 18. See Appx0578 at col. 11, ln. 53-55.

The Current Condition Computing Section 16 receives a reference torque T* from a supervisor controller (not illustrated in Figure 1) and the motor rotational speed N from a motor rotational-position sensor 20. See Appx0578 at col. 12, ln. 54-57. The Current Condition Computing Section 16 determines the field reference current $I_d$* and the reference torque current $I_q$* in accordance with the reference torque T* and motor rotational speed N. See Appx0578-0579 at col. 11, ln. 55-62 & col. 12, ln. 54 - col. 13, ln. 49. Appellant agrees that the $I_d$* and $I_q$* signals depicted as being output by the Current Condition Computing Section 16 in Kusaka's Figure 1 correlate with the dr-axis injection current demand and the IQr demand recited in claim 12 of the '895 patent, respectively. See Appx0837-0838.

Next, the Current Control Section 18 receives these $I_d$* and $I_q$* signals, as well as "the angular position $\Theta$ of the rotor of the motor 14 detected by a motor rotational-position sensor 20 affixed to the motor 14." See Appx0578 at col. 11, ln. 63-66. In the Current Control Section 18, the $I_d$* and $I_q$* axis reference currents

are transformed from the rotating frame of reference to the three-phase current demands denoted Iu*, Iv*, Iw* in the stationary frame of reference, which are then fed to the inverter 12 to create three-phase voltages to drive the motor 14. See Appx0578 at col. 11, ln. 66 - col. 12, ln. 21; see also Appx0304.

Appellees' expert, Dr. Ehsani, testified on direct that "Kusaka teaches that the q- and d-axis currents ***are combined*** in the current control section 18 to produce the appropriate u, v, and w currents that are then used to determine the current that is provided to each of the three windings of the PM Motor." Appx0680 at ¶70 (citing Kusaka at col. 11, ln. 53 - col. 12, ln. 21; emphasis added); see also Appx0139-0141 (Corrected Petition) at Appx0141 (citing Ex. 1010, ¶70-71); Appx0239; see also Appx1007 at ln. 14 - Appx1008 at ln. 7.

## SUMMARY OF THE ARGUMENT

The Board construed the "combining" claim term recited in claim 12 under the BRI standard to mean "intermixing". In the admitted absence of any relevant intrinsic evidence, it was within the Board's discretion to consider extrinsic evidence, such as dictionary definitions, in construing the "combining" claim term. See *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-19 (Fed. Cir. 2005) (*en banc*). The dictionary definition now relied upon by Appellant includes "intermix" as one of the meanings for the verb "combine". See Appellant's Br. at p. 23 (citing http://www.merriam-webster.com/dictionary/combine). Thus, Appellant cannot show that the Board erred in construing "combining" to mean "intermixing", which is a dictionary meaning.

Furthermore, while the Board's construction of "intermixing" encompasses both the so-called "vectorizing", and "multiplexing" embodiments of the '895 patent, Appellant's proposed construction of that term would not. A claim construction "that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013).

Appellant implies that the Board misapplied this Court's *Kennametal* decision by relying thereon in the context of the electrical field which typically does not present genus/species circumstances. See Appellant's Br. 5 & 37-38.

However, this Court has done just that. See *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1341-44 (Fed. Cir. 2016) (applying *Kennametal* to affirm the Board's determination that the disputed claims are anticipated by the prior art Paul reference which discloses "an Internet-based e-mail communication system that broadcasts communications to members.").

The Board's determination that claim 21 of the '895 patent is anticipated under *Kennametal* based on Kusaka is supported by substantial evidence -- Kusaka itself and the declaration of Dr. Blank. In its Patent Owner Response, Appellant admitted that the set of equations presented in Dr. Blank's declaration constitutes "a ***standard form*** of transformation" that could be used by Kusaka's Current Control Section 18 to transform the Id*, Iq* and Θ inputs into the set of Iu*, Iv* and Iw* outputs. See Appx0325 (emphasis added). The Board found that Kusaka's "set of Iu*, Iv*, and Iw* is an IQdr demand as we have construed the term". Appx0019. Appellant has not expressly challenged this factual finding, much less shown that the Board lacked substantial evidence therefor. Under its construction of "combining" as meaning "intermixing", the Board correctly held that under *Kennametal*, Kusaka anticipates claim 21 because the set of Iu*, Iv* and Iw*, which is an IQdr demand, is produced as a result of combining the IQr demand and dr-axis injection current demand, in view of the set of equations presented in Dr. Blank's declaration. See Appx0019-0021. It was reasonable for

the Board to have concluded that a person of ordinary skill, reading Kusaka, would have "at once envisaged using this "***standard form*** of transformation from the rotating frame of reference to the stationary frame" to perform the disclosed function in Kusaka's Current Control Section 18. See *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015).

Alternatively, the set of equations presented by Dr. Blank in his declaration, along with an admission made by Appellant at the Oral Hearing that there are no other equations falling outside the scope of the "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand" limitation, establish that Kusaka inherently anticipates claim 21. "Appellees always have the right to assert alternative grounds for affirming the judgment that are supported by the record." *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 822 n.1 (Fed. Cir. 1989).

# ARGUMENT

## A. Appellant Has Not Shown That The Board Erred In Construing The "Combining" Claim Term

Claim 12 recites, *inter alia*, "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand …." See Appx0039. In the Final Written Decision, the Board construed the "combining" claim term to require the intermixing of the Iq and Id components. See Appx0019-0021. Appellant has not shown that the Board has erred in doing so. Indeed, the dictionary definition now relied upon by Appellant includes "intermix" as one of the meanings for the verb "combine". See Appellant's Br. at p. 23 (citing http://www.merriam-webster.com/dictionary/ combine).

As an initial matter, Appellant seeks to denigrate the Board's construction of the "combining" claim term for having been made at the "eleventh-hour". See Appellant's Br. 21. However, this Court has made clear that there is no fixed deadline by which a claim term must be finally construed.

> [A] district court may engage in claim construction during various phases of litigation, not just in a *Markman* order. We have recognized that district courts may engage in "rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."

*Conoco, Inc. v. Energy & Envtl., Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) (quoting *Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002)); see also *Wi-LAN USA, Inc. v. Apple Inc.*, ____ F.3d ____, 2016 WL 4073324, at *7 (Fed. Cir. Aug. 1, 2016).

Appellant has not identified which standard of review -- *de novo* or substantial evidence -- applies to this Court's review of the Board's construction of the "combining" claim term. See Appellant's Br. 21-30. In *Cuozzo*, this Court adopted the standard of review set forth in *Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) for reviewing the Board's claim constructions. See *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1279-80 (Fed. Cir. 2015), *aff'd*, *sub. nom.*, *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 1231 (2016). Under *Teva*, factual disputes over extrinsic evidence (e.g., expert testimony, dictionaries, and treatises) are questions of fact to be reviewed for substantial evidence, while the ultimate claim construction is a question of law to be reviewed *de novo*. See *Teva*, 135 S. Ct. at 841; *Cuozzo*, 793 F.3d at 1279-80. Therefore, the parties' dispute about the dictionary definition of "combining" should be reviewed by this Court for substantial evidence. Nevertheless, the Board's construction of "combining" should be affirmed, regardless of the standard of review.

This claim construction issue arose because, as Appellant agrees, the '895 patent specification does not define the "IQr demand," "dr-axis injection

current demand," and "IQdr demand" claim terms[3]. See Appx0230; Appellant's Br. 9 ("The specification of the '895 Patent does not expressly define the parameters "IQr demand" and "Idr demand"). However, claim 12 itself defines the "IQdr demand" as being produced by "combining the IQr demand and the dr-axis injection current demand". See Appx0039 at col. 10, ln. 13-14. In its initial Decision, the Board construed the following terms recited in claim 12 of the '895 patent:

| Claim Term | Construction |
|---|---|
| "IQr demand" | Q-axis demand current |
| "dr-axis injection current demand" | d-axis injection current |
| "IQdr demand" | a current demand that includes Q- and d-axis current demands |

See Appx0230. Appellant is not challenging these claim constructions.

In its initial Decision (Institution of Inter Partes Review), the Board did not construe the word "combining" recited in claim 12 because neither party requested

[3] The '895 patent specification "need not include information that is already known and available to the experienced public". See *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 405 F.3d 985, 987 (Fed. Cir. 2005). Thus, the failure of the '895 patent specification to define the "IQr demand," "dr-axis injection current demand," and "IQdr demand" claim terms suggests that those terms/concepts were already known in the prior art.

the Board to do so. See Appx0227-0230. In its Response to the IPR petition, while Appellant argued that claim 21 is not anticipated because neither Kusaka nor Walters discloses the "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand" limitation, Appellant did not expressly present a proposed construction for the "combining" claim term. See Appx0303-0305, & 0318-0329.

During the Oral Hearing before the Board, Appellees explained the meaning of "combining" in the context of the recited limitation as follows:

> JUDGE BOUCHER: If I could interrupt you there again, because there are these various claim construction positions, but my recollection is that the Petitioner has not offered any claim construction of the word "combining" in claim 12. And it seems to me that some of the dispute between the parties on this issue hinges on what combining actually means.
>
> So I want to give you an opportunity to indicate whether or not the Petitioner has a position on what combining means, because I think that bears on your discussion of vectorizing also.

> MR. MEYER: Yes, I will get to our proposed definition of combining, but, in essence, what it is, is if you have the two signals, the Iq and the Id and you are sending them to one location and they are being used together for some function, that is a combination, and we will get to that….

Appx0404-0405. This meaning of "combining" is implicit in Appellees' Ground 3 based on Kusaka as presented in the IPR Petition. See Appx0139-0141. Appellees' expert, Dr. Ehsani testified in his Declaration that the Iq and Id signals are sent to Kusaka's Current Control Section 18 where they are used together for the function of producing the Iu*, Iv* and Iw* values:

> 70. Kusaka teaches that ***the q- and d-axis currents are combined in the current control section 18 to produce the appropriate u, v, and w currents*** that are then used to determine the current that is provided to each of the three windings of the PM Motor. *See* Kusaka, Col. 11:53-Col. 12:21.

Appx0680 (emphasis added); see also Appx0139-0141 (Corrected Petition) at Appx0141 (citing Ex. 1010, ¶70-71); Appx0363-0364 (Petitioner's Reply); see also Appx1007 at ln. 14 - Appx1008 at ln. 7.

Later in the Oral Hearing, Appellees informed the Board of a dictionary definition of "combining":

> MR. MEYER: I have a few rebuttal points….
>
> * * *
>
> Okay. Now, with respect to claim 12, the combining. The dictionary definition of combining includes intermixing….
>
> * * *
>
> JUDGE BOUCHER: But you didn't provide that dictionary definition in the record, right?
>
> MR. MEYER: No, we did not, but it is my understanding under the Federal Circuit case law that a court can take judicial notice of dictionary definitions of non-technical terms. I could provide you those case supports if you would like.
>
> JUDGE BOUCHER: I think we are good. Thank you.

Appx0435-0437. The Board can take judicial notice of dictionary definitions of non-technical terms. <u>See</u> Fed. R. Evid. 201(b)(2); 37 C.F.R. §42.62(a) ("Except as otherwise provided in this subpart, the Federal Rules of Evidence shall apply to a

proceeding."); see also *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir. 2001); *Pyles v. Merit Sys. Prot. Bd.*, 45 F.3d 411, 415 (Fed. Cir. 1995); *Stewart-Warner Corp. v. U.S.*, 748 F.2d 663, 669 (Fed. Cir. 1984).

During the Oral Hearing, Appellant likewise told the Board that the "combining" claim term should be given its ordinary meaning. See Appx0413 ("They really truly ascribe no meaning to the word combining. We say that this claim language has its plain, ordinary English language meaning as further described by the Board in its construction of what an IQdr demand would be.").

The parties agree that there is no intrinsic evidence pertaining to the meaning of "combining" as recited in claim 12 of the '895 patent.

> As Appellees conceded before the Board, the word "combining" appears nowhere else in the '895 Patent besides claim 12. Appx0355 n.1. No form of "combine" appears anywhere else in the Patent's claims or specification. *See generally* Appx0026-40. And the prosecution history of the '895 Patent reveals no evidence that the patentee ascribed any special meaning to "combining". *See generally* Appx0454-512.

Appellant's Br. 23-24. Consequently, it was within the Board's discretion to consider extrinsic evidence, such as dictionary definitions, in construing the

"combining" claim term. See *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-19 (Fed. Cir. 2005) (*en banc*).

The definition of the verb "combine" provided by the Merriam-Webster Online Dictionary cited by Appellant, but not fully quoted in Appellant's brief, includes "2: intermix, blend", giving as an example "*combine* the sugar and flour". See Appellant's Br. 23 (citing http://www.merriman-webster.com/dictionary/combine). This is consistent with the dictionary definition that Appellee presented to the Board at the Oral Hearing (see Appx0435 ("The dictionary definition of combining includes intermixing.") & Appx0436 ("Also, again intermixing is the dictionary definition of the word combining.")) and that appears in the Board's Final Written Decision (see Appx0019-0020). This dictionary definition is the substantial evidence supporting the Board's construction of the "combining" claim term.

Appellant cites to *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1375 (Fed. Cir. 2004) for the ordinary meaning of the term "combine". See Appellant Br. 23. In *Gemstar*, the Federal Circuit adopted the second of several alternative meanings provided in Webster's Third New International Dictionary (1993) [see Appx1288-1291] for the verb "combine" as the ordinary meaning therefor.

> The ordinary meaning of "combining," which is a present participle of "combine," is "to cause (as two or more things or ideas) to mix together. MINGLE: BLEND." *Webster's Third New International Dictionary* 452 (1993). This broad definition of "combining" as mixing or blending is not constrained to the specific logical AND/OR combinations required by the ITC's construction. Instead, "combining" may encompass any logical combination of the user selection criteria.

*Gemstar*, 383 F.3d at 1375. This meaning of "combining" from Webster's Third New International Dictionary (1993) [see Appx1291] tracks the second alternative meaning provided by Webster's current online definition of "combine" (see http://www.merriam-webster.com), in view of the common appearance of the word "blend" and the root "mix" (i.e., "mix together" / "intermix").

An alternative meaning of the verb "combine" provided by the Merriam-Webster Online Dictionary cited by Appellant is: "1a: to bring into such close relationship as to obscure individual characters : MERGE < two companies *combining* forces >; b: to cause to unite into a chemical compound; c: to unite into a single number or expression < *combine* fractions and simplify >". See http://www.merriam-webster.com/dictionary/combine. Now, on appeal, Appellant

seeks to graft meaning 1c (i.e., "to unite into a single number or expression") onto the alternative meaning 2 (i.e., mixing together / intermixing or blending). See Appellant's Br. 23 & 30. There is no basis for doing so. See *Gemstar*, 383 F.3d at 1375 ("This broad definition of 'combining' as mixing or blending is not constrained….").

Furthermore, the meaning 1c (i.e., "to unite into a single number or expression") appearing in the ***current*** Webster's online dictionary does not appear in the definition of "combine" from Webster's Third New International Dictionary 452 (1993) (see Appx1291). Accord Appellant's Br. 23. Appellant has not shown that the broad meaning of "combine" has changed during the relevant time period from the 1993 definition in Webster's Third New International Dictionary to the December 2, 2005 filing date of the '895 patent. See *Phillips*, 415 F.3d at 1313 ("We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.").

Below, Appellant admitted that the "combining" claim term must encompass ***both*** the "vectorizing" embodiment and the "multiplexing" embodiment disclosed by the '895 patent so long as both Id and IQ axis current signals are present.

> JUDGE BOUCHER: So what does combining mean then? Is multiplexing an example of combining?
>
> MR. BROWN: I believe multiplexing can be an example of combining. ***We are not arguing that vectorizing is the only form of combination***. Vectorizing is the preferred embodiment in the '895 but it is not limited to that.
>
> ***You have to have some form of combining of these signals so that you have a signal that contains both of those elements within it….***

Appx0414 (emphasis added). A claim construction "that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013). Webster's online dictionary's meaning 2 of "combine" (i.e., intermix, blend < *combine* the sugar and flour >) is the proper construction because it encompasses both the vectorizing and the multiplexing embodiments, whereas Appellant's urged meaning 1c ("to unite into a single number or expression") does not.

First, with respect to the "vectorizing" embodiment, as depicted in Figure 2 of the '895 patent, which is reproduced below with highlighting, the IQdr demand signal is fed by the Vectorize box 212 (highlighted in orange) to the Iqr Current

Controller 218 and the Idr Current Controller 220, along with the Iqdr actual signal and the estimated electric speed signal.

Appx0028




FIG. 2

The use later made of this IQdr demand signal evidences which dictionary meaning of "combining" is appropriate. The IQr Current Controller 218 (highlighted in purple) uses the IQdr demand signal 214 to convert the IQr demand in the rotating frame of reference to a voltage ("V") signal for the Q-axis of the rotating frame of reference -- the VQr signal. Similarly, the Idr Current Controller 220 (highlighted in blue) uses the IQdr demand signal 214 to convert the Idr demand in the rotating frame of reference to a separate voltage ("V") signal for the

d-axis of the rotating frame of reference -- the Vdr signal. See Appx0036 at col. 3, ln. 14-19.

During the Oral Hearing, Appellant explained that the IQr demand signal and the Idr demand signal can be separated out of the "concatenated" IQdr demand signal by the IQr Current Controller 218 and the Idr Current Controller 220.

> JUDGE BOUCHER: Actually before you go on, I just want to make sure I understand this correctly, because subsequent to that in this drawing there are lines that go to the IQr Current Controller 218 and the Idr Current Controller 220.
>
> So is it correct that the individual IQr demand and Idr demands in the IQdr demand are independently recognizable?
>
> MR. BROWN: Well, I think in the case of the '895 embodiment we're talking about a vector. So if it is a vector it is going to have a direction and a quantity. And then the blocks 218 and 220 can take that vector quantity and determine the components of it that would be Iq and Id.

> Those are, in the rotating frame of reference, those are orthogonal signals, so you can decompose that vector within those two separate blocks to determine how much of it is Iq and how much of it is Id.

Appx0415-0416.

Thus, in the "vectorizing" embodiment, the "concatenated" IQdr demand signal 214 is not "a single number or expression", but rather an intermixing of the still independently recognizable IQr demand and Idr demand signals.

Second, with respect to the "multiplexing" embodiment, Figure 9 of the incorporated-by-reference '379 patent, which is reproduced below with highlighting, depicts a Torque to IQdr Map block 904 and an Idr injection block 906 [Appx1074 at col. 5, ln. 51-53].




FIG. 9

The IQr demand signal and Idr demand signal are "multiplexed" to produce the IQdr demand signal. See Appx1074 at col. 5, ln. 53-57. Appellant's expert, Dr. Blank, explained that the output on the IQdr demand line 908 switches between the IQr demand input signal and the Idr demand input signal. See Appx0856-0857. That is, the IQdr demand signal comprises an interleaving of the IQr demand signals and the Idr demand signals.

Thus, in the "multiplexing" embodiment, the "multiplexed" IQdr demand signal is not "a single number or expression", but rather is an ordered intermixing of the still independently recognizable IQdr demand and Idr demand signals onto a single electrical transmission line.

Lastly, Appellant argues that the ordinary meaning of the "combining" claim term precludes any mathematical operations being performed on either of the IQr demand signal or the Idr demand signal before those IQr demand and Idr demand signals are mixed together. See Appellant's Br. 27-30. Not only is Appellant's urged construction not borne out by any dictionary definition of "combining" (see Appx0020) or any other language recited in claim 12, it would exclude the "multiplexing" embodiment from the scope of claim 12. Figure 9 of the incorporated-by-reference '379 patent, which depicts the "multiplexing" embodiment is reproduced below.




Appx1067

FIG. 9

As shown by the yellow highlighted portion of Figure 9, prior to the multiplexing of the Idr demand and IQr demand signals, the Idr demand signal is multiplied by a gain factor, which occurs at the box containing an "x" multiplication sign and the word "Product" adjacent thereto. Again, a claim construction "that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent*, 707 F.3d at 1326.

Moreover, Appellant's proposed construction is seemingly at odds with the distributive property of multiplication. Under the distributive property of multiplication: a x Id + a x IQ = a x (Id + IQ). Under Appellant's proposed construction a x (Id + IQ) would be within the scope of "combining" because the additive operation within the parenthesis goes first, before the multiplication by factor a; but a x Id + a x IQ would be outside the scope of "combining" because the

multiplication by factor a occurs before the addition of Id and IQ, despite the fact that the end result is the same.

Furthermore, Appellant seeks to improperly support this aspect of its claim construction argument here on appeal with the equations presented in Dr. Blank's declaration (Appx1093 at ¶27). See Appellant's Br. 29-30. Below, Appellant relied upon these equations as support for its argument that Kusaka does not anticipate claim 21, but not in support of any claim construction argument. See Appx0299-0330 (Patent Owner's Response) at Appx0325 (citing Ex. 2001, ¶¶27-29); Appx0395-0438 (Oral Hearing Transcript) at Appx0420-0423 (discussing Dr. Blank's declaration at ¶¶26-28). "A party may not introduce new claim construction arguments on appeal…." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008).

In sum, the Board's construction of the "combining" claim term to mean "intermixing" is correct as a matter of law because it encompasses both preferred "vectorizing" and "multiplexing" embodiments, whereas Appellant's urged construction does not.

### B. Appellant Has Not Shown That The Board Erred In Concluding That Claim 21 Is Anticipated By Kusaka Under *Kennametal*

Anticipation under 35 U.S.C. §102 is a question of fact. *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1382 (Fed. Cir. 2015). This Court reviews the Board's factual findings for substantial evidence. Id. "Substantial

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012)). Here, Appellant has failed to show that the Board's conclusion that claim 21 is anticipated by Kusaka is not supported by substantial evidence.

The Board "conclude[d] that [Appellees] have demonstrated, by a preponderance of the evidence, that claim 21 is anticipated by Kusaka." See Appx0021. The Board's factual findings about the disclosure of Kusaka are supported by substantial evidence. Indeed, the Board fully considered all of the relevant evidence of record: (1) Kusaka itself (see Appx0554-0586); (2) the declaration of Appellee's expert, Dr. Ehsani (see Appx0677-0680 at ¶¶63-71); and (3) the declaration of Appellant's expert, Dr. Blank (see Appx1085-1093 at ¶¶19-28). See Appx0017-0021.

To anticipate a patent claim, a prior art reference must expressly or inherently disclose each claim limitation. See *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 975 (Fed. Cir. 2010). Here, the Board properly compared Kusaka's disclosure with the limitations recited in independent claim 12 and claim 21 which depends from claim 12. See Appx0012 & 0017-0021. Appellant's comparisons of Kusaka's disclosure with the '895 patent specification and, in

particular, with Figure 2 of the '895 patent, are irrelevant as a matter of law. Cf. Appellant's Br. 30-32 & 34.

### 1. The Board Did Not Change Theories In Midstream

Contrary to Appellant's implications, the Board did not change theories in midstream. In its Final Written Decision, the Board held claim 21 to be anticipated under §102(b) based on Kusaka, which is the ground set forth in its institution decision (compare Appx0017-0021 & Appx0238-0239). See *Genzyme Therapeutic Prods. LP v. Biomarin Pharm. Inc.*, ____ F.3d ____, 2016 WL 3254734, at *4 (Fed. Cir. June 14, 2016).

Figure 1 of Kusaka, which is reproduced below, is "a block diagram showing the system constitution of an electric vehicle to which each embodiment of the present invention is suitable" [Appx0577 at col. 10, ln. 38-40].




Fig. 1

"The system shown in FIG. 1 is an electric vehicle drive system and its controller …. [T]he electric discharge output of battery 10 is converted from DC to 3-phase AC by an inverter 12 and fed to a PM motor 14." See Appx0578 at col. 11, ln. 48-52. Power conversion in the inverter 12 is vector-controlled by a Current Condition Computing Section 16 and a Current Control Section 18. See Appx0578 at col. 11, ln. 53-55.

Claim 12 of the '895 patent recites "calculating an IQr demand from a speed or torque demand". See Appx0039. In its institution decision, the Board construed "IQr demand" to mean "Q-axis current demand". See Appx0230. The Board maintained this construction in its Final Written Decision. See Appx0013-0014. Appellant does not dispute that Kusaka's reference torque current Iq* (shown as an input to the Current Control Section 18 in Figure 1) correlates with the recited IQr demand or that Kusaka expressly discloses this limitation recited in claim 12 of the '895 patent. See Appx0238-0239; Appx0318-0325; Appx0017-0021.

Claim 12 of the '895 patent next recites "calculating a dr-axis injection current demand as a function of a speed of the rotor". See Appx0039. In its institution decision, the Board construed "dr-axis injection current demand" to mean "d-axis injection current". See Appx0230. The Board maintained this construction in its Final Written Decision. See Appx0013-0014. Appellant does not dispute that Kusaka's field reference current Id* (shown as an input to the

Current Control Section 18 in Figure 1) correlates with the recited dr-axis injection current demand or that Kusaka expressly discloses this limitation recited in claim 12 of the '895 patent. See Appx0238-0239; Appx0318-0325; Appx0017-0021.

Lastly, claim 12 further recites "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand…." See Appx0039. In its institution decision, the Board construed "IQdr demand" to mean "a current demand that includes Q- and d-axis current demands". See Appx0230. The Board maintained this construction. See Appx0013-0014. Appellant is not challenging the Board's construction of the "IQdr demand" term here on appeal. Indeed, Appellant told the Board that the "combining" claim term "has its plain, ordinary English language meaning as further described by the Board in its construction of what an IQdr demand would be." Appx0413.

Referring back to the above-reproduced Figure 1 of Kusaka, the Current Control Section 18 receives these Id* and Iq* signals, as well as "the angular position Θ of the rotor of the motor 14 detected by a motor rotational-position sensor 20 affixed to the motor 14." See Appx0578 at col. 11, ln. 63-66. In the Current Control Section 18, the Id* and Iq* axis reference currents are transformed from the rotating frame of reference to the three-phase current demands denoted Iu*, Iv*, Iw* in the stationary frame of reference, which are then fed to the inverter

12 to create three-phase voltages to drive the motor 14. See Appx0578 at col. 11, ln. 66 - col. 12, ln. 21; see also Appx0304.

In its Corrected Petition, Appellees alleged that the "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand that is compensated for any torque contribution of dr-axis current" limitation is disclosed by the transformation of the Id* and Iq* axis reference currents by the Current Control Section 18. See Appx0139-0141. In support of the Corrected Petition, Appellees' expert, Dr. Ehsani, testified:

> 70. Kusaka teaches that the q-and d-axis currents are combined in the current control section 18 to produce the appropriate u, v, and w currents that are then used to determine the current that is provided to each of the three windings of the PM Motor. *See* Kusaka, Col. 11:53-Col. 12:21.

Appx0680. In its institution decision, the Board credited this testimony of Dr. Ehsani:

> In addition, Petitioners contend that Kusaka discloses combining the IQr demand and the dr-axis injection current demand, noting Kusaka's disclosure of compensating for torque contributions by the d-axis

> current. Pet. 36-38. Petitioners' analysis is supported by the declaration testimony of Dr. Ehsani. Ex. 1010 ¶¶63-71.

Appx0239. This same position forms the basis of the Board's Final Written Decision. See Appx0018-0019.

In sum, neither the Board nor Appellees changed theories midstream.

**2. The Board Properly Relied Upon Dr. Blank's Declaration In Concluding That Kusaka Discloses the "Combining the IQr Demand and the dr-axis Injection Demand to Produce an IQdr Demand…" Limitation Under *Kennametal***

The parties' dispute regarding the disclosure of Kusaka centers on the operation of the Current Control Section 18 which is highlighted in yellow in the below reproduced Figure 1 of Kusaka.




Fig. 1

As depicted in Figure 1, the Current Control Section 18 converts inputted Id*, Iq* and Θ values into the outputted three phase current Iu*, Iv* and Iw* values. As an issued patent, Kusaka is presumed to be enabling. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). Below, Appellant did not even attempt to rebut this presumption of enablement. Cf. Appx0318-0325.

Along with its Patent Owner Response, Appellant filed a declaration by its expert, Dr. Blank, with the Board. See Appx0331-0332. In his declaration, Dr. Blank identified a set of equations that could be used by Kusaka's Current Control Section 18.

> 27. Similarly, a typical transform from the d-q frame of reference to the abc (uvw) frame of reference is shown below:
>
> $$Ia = Id \cos \Theta - Iq \sin \Theta$$
>
> $$Ib = Id \cos (\Theta - 2\pi/3) - Iq \sin (\Theta - 2\pi/3)$$
>
> $$Ic = Id \cos (\Theta + 2\pi/3) - Iq \sin (\Theta + 2\pi/3)$$

See Appx1092-1093 at ¶¶26-27. In its Patent Owner Response, Appellant admitted that this set of equations constitutes "a ***standard form*** of transformation from the rotating frame of reference to the stationary frame…." Appx0325 (emphasis added); see also Appx0019 (quoting same).

In the stationary abc (uvw) frame of reference, the Ia value in the above set of equations correlates with Kusaka's Iu*, the Ib value correlates with Kusaka's Iv*, and the Ic value correlates with Kusaka's Iw*. See Appx0019-0020; see also Appellant's Br. 12 n.1 ("Kusaka's 'Iu, Iv, and Iw' notation is directly interchangeable with the 'Ia, Ib, and Ic' notation used … in the declaration of Nidec's expert, Dr. Gary Blank."). It bears repeating that the Board has construed the recited "IQdr demand" to mean "a current demand that includes Q- and d-axis current demands" (see Appx0230; Appx0013-0014), and that Appellant has not challenged this construction of the "IQdr demand" claim term.

The Board has found that Kusaka's "***set*** of Iu*, Iv*, and Iw* is an IQdr demand as we have construed the term". Appx0019 (emphasis added). Appellant has not expressly challenged this factual finding, much less shown that the Board lacked substantial evidence therefor. Cf. Appellant's Br. 32-40. Under its construction of "combining" as meaning "intermixing", the Board held that under *Kennametal*, Kusaka anticipates claim 21 because the set of Iu*, Iv* and Iw*, which is an IQdr demand, is produced as a result of combining the IQr demand and dr-axis injection current demand, in view of the set of equations presented in Dr. Blank's declaration. See Appx0019-0021.

More particularly, with respect to the above-reproduced set of equations, the set of Iu*, Iv*, and Iw* (i.e., the IQdr demand) were said to be produced by

combining IQr demand and the dr-axis injection current demand because for each of Ia, Ib and Ic equations reproduced above, *both* Id and Iq appear in each equation. See Appx0019-0020. This fact is undisputable. See Appx1093 at ¶27. Moreover, the Board's factual finding is consistent with the ordinary meaning of "combining".

It is true that in each of the equations, the Id value is multiplied by cos Θ and the Iq value is multiplied by sin Θ. See Appx1093 at ¶27. The angle Θ is the angular position of the rotating rotor of the motor. See Appx0578 at col. 11, ln. 63 - col. 12, ln. 5. Because the motor rotor rotates through a complete circle, the angle Θ varies from 0 to 360 degrees, which converts 0 to 2π radians. See www.wikihow.com/convert-radians-to-degrees. The value of both cos Θ and sin Θ will range from -1 to 1, as Θ varies from 0 to 2π radians.



The sine and cosine functions graphed on the Cartesian plane.

See https://en.wikipedia.org/wiki/trigonometric__functions#/media/file: sine__ cosine__one__period.org. That is, each of Iq and Id is being multiplied by a factor having a numerical value between -1 to 1 before being combined together. As

discussed supra at pp. 44-46, a construction of the "combining" claim term that encompasses the "multiplexing" embodiment would allow for the Iq and Id to be multiplied by such a factor before being combined. See Appx0020 ("Patent Owner's position that 'combining Iq and Id requires that they be combined before they be further operated on' applies too restrictive a meaning of 'combining'.").

First, on appeal, Appellant contends that "Appellees never argued that these equations showed the required 'combining'." See Appellant's Br. 28. Appellant is simply wrong. During the Oral Hearing, Appellees expressly did so:

> Okay. Now, with respect to claim 12, the combining. The dictionary definition of combining includes intermixing. Therefore, as counsel for Patent Owner was asked before about Mr. Blank's equations in his declaration shown in Patent Owner's demonstrative DX 18, ***these equations I submit would be an intermixing of Iq and Id because each one of them includes both Id and Iq.***

Appx0435 (emphasis added).

Second, Appellant seemingly implies that the Board erred by considering this set of equations because they were first presented by Patent Owner's expert, Dr. Blank, and not by Appellees along with their IPR Petition. See Appellant's

Br. 37 ("the Board then relied on equations supplied only in Dr. Blank's declaration…."). However, this Court has held that the Board can rely upon evidence in its Final Written Decision that was not originally presented with the IPR petition, but rather was developed during the course of the instituted trial. See *Genzyme*, 2016 WL 3254734, at **3-7. Here, Appellant was not deprived of due process because the set of equations was presented to the Board by Appellant itself, through the declaration of its expert, in the context of what is disclosed by Kusaka. See Appx1089-1093 at ¶¶24-28; Appx0325 (citing Ex. 2001, ¶¶27-29).

Third, Appellant argues that "the Board misapplied the law of anticipation generally and *Kennametal* in particular". See Appellant's Br. 5 & 37-38. Appellant is, once again, wrong. The passage in *Kennametal* cited by the Board (see Appx0021) states:

> A prior art reference can only anticipate a claim if it discloses all the claimed limitations 'arranged or combined in the same way as in the claim.' However, a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination.

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (citations omitted). The above-quoted statement of the law of anticipation is written to have general applicability, and is not expressly limited to a genus/species situation. Cf. Appellant's Br. 37-38. Indeed, the words "genus" and "species" appear nowhere in the *Kennametal* decision. See also *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1341-44 (Fed. Cir. 2016) (applying *Kennametal* to a non-genus/species situation).

More particularly, *Kennametal* did not involve the issue of whether the disclosure of a chemical genus in the prior art anticipates a claim directed to a species within that genus. Cf. Appellant's Br. 38. In *Kennametal*, challenged claim 1 recited a cutting tool containing ruthenium as a binder that is coated using physical vapor deposition ("PVD"). See 780 F.3d at 1379. The prior art Grab patent discloses cutting tools with a binder that "includes one or more of tungsten, iron, nickel, *ruthenium*, and rhenium", and one or more coating layer deposited by PVD, chemical vapor deposition ("CVD") or moderate temperature chemical vapor deposition ("MTCVD"). Id. at 1380. None of the elements listed in Grab as a binder is a species to the other listed elements or to some unnamed genus. Likewise, none of these coating methods were said to be a species to the other coating methods or to some unnamed genus coating method. See *Kennametal*, 780 F.3d at 1379-83.

Patent Owner Kennametal contended that Grab is not anticipatory because Grab allows for 10,881 possible combinations.

> It notes that Grab discloses five potential metals to use in the binder, which, allowing for combinations of metals (*e.g.*, the combination of tungsten and ruthenium), allows for 31 different possibilities-although it recognizes that 16 of these include ruthenium. Kennametal also notes that the examples in Grab include three to five coating layers. Kennametal asserts that allowing for three options for each coating creates a total of 351 possible coating solutions, which, when multiplied by the 31 different binder possibilities, allows for 10,881 possibilities.

Id. at 1381-82. Reexamination Requestor Ingersoll countered that "a person of ordinary skill in the art reading Grab would immediately envisage examples using one metal as a binder and one type of coating - not combinations of multiple metals or multiple coatings." Id. at 1382. The Federal Circuit affirmed the Board's determination that claim 1 is anticipated by the prior art Grab patent, holding that "Grab effectively teaches 15 combinations, of which one anticipates pending claim 1." Id. at 1383.

Kusaka teaches that the Current Control Section 18 calculates the Iu*, Iv* and Iw* based on angular position Θ of the rotor of the motor 14 and the values of Id* and Iq*. See Appx0578 at col. 11, ln. 63 - col. 12, ln. 5; Appx0555 (Fig. 1). Appellant told the Board that the set of equations presented in Dr. Blank's declaration (see Appx1093 at ¶27) is "a ***standard form*** of transformation from the rotating frame of reference to the stationary frame…." Thus, it was reasonable for the Board to have concluded that a person of ordinary skill, reading Kusaka, would have "at once envisaged" using this "***standard form*** of transformation from the rotating frame of reference to the stationary frame" to perform the disclosed function in the Current Control Section 18. See *Blue Calypso*, 815 F.3d at 1344 ("Just as in *Kennametal*, there is no suggestion here that one of skill in the art would not have the ability to use the direct e-mail campaign tool option in conjunction with the refer-a-friend campaign tool to send refer-a-friend e-mail message incentives to a subset of the members based on member demographic characteristics [as recited in the disputed claims].").

Moreover, in *Kennametal*, the Federal Circuit observed that the theoretical existence of other possible anticipatory combinations did not negate the invalidating effect of the one anticipatory combination that the Board relied upon to invalidate claim 1. See *Kennametal*, 780 F.3d at 1382 ("The fact that a skilled artisan had various ways of formulating a coated cutting insert based on Grab's

teaching does not help Kennametal, since many of these are within the scope of its claim."). Here, Dr. Blank's "standard form of transformation" is within the scope of claim 12 because for each of the Ia, Ib and Ic equations reproduced above, *both* Id and Iq appear in each equation. See Appx1093 at ¶27; Appx0019-0020. During the Oral Hearing, Appellant admitted to the Board that there is not evidence of any transformation that does not include both Iq and Id.

> JUDGE BOUCHER: I just want to verify, though, that Dr. Blank has given no example in which Ia, b and c involve only one of Iq and Id, that in example C says they all involve some component of Iq and Id. Is that accurate?
>
> MR. BROWN: Yes. Yes, that's accurate.

Appx0423 at ln. 9-13. That is, any other form of the transformation would fall within the Board's construction of "combining" because *both* Iq and Id would appear in each equation. Thus, the Board properly relied upon Appellant's admission under *Kennametal*. See Appx0021 (citing Tr. 29:9-13).

Alternatively, applying Appellant's proposed "genus" and "species" labels (see Appellant's Br. 38), Kusaka discloses a "genus", that being a mathematical transformation from the rotating frame of reference to the stationary frame. See Appx0578 at col. 11, ln. 63 - col. 12, ln. 5; Appx0555 (Fig. 1). A person of

ordinary skill in the art, reading Kusaka, would at once envisage the species consisting of the set of equations set forth in Dr. Blank's declaration (see Appx1093 at ¶27) because those equations, admittedly, are "a ***standard form*** of transformation". See Appx0325. That Appellant now surmises that there *may possibly* be other specie equations for transformation from the rotating frame of reference to the stationary frame (see Appellant's Br. 15 & 36 ("it is entirely possible that…") does not help Appellant since Appellant admitted below that all would be within the scope of the Board's construction of "combining" (see Appx0423 at ln. 9-13). See *Kennametal*, 780 F.3d at 1382.

### C. The Board's Judgment That Claim 21 Is Invalid Can Be Affirmed On The Alternative Ground That Kusaka Inherently Discloses The "Combining"

Appellant does not dispute that Kusaka expressly discloses all of the limitations recited in claims 12 and 21 of the '895 patent except for the "combining the IQr demand and the dr-axis injection current demand to produce an IQdr demand…." limitation recited in claim 12. The record on appeal allows this Court to affirm the Board's judgment that claim 21 is anticipated by Kusaka on the alternative ground that Kusaka inherently discloses this limitation. See *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 822 n.1 (Fed. Cir. 1989) ("Appellees always have the right to assert alternative grounds for affirming the judgment that are supported by the record.").

The parties' dispute regarding the disclosure of Kusaka centers on the operation of the Current Control Section 18 which is highlighted in yellow in the below reproduced Figure 1 of Kusaka.




Fig. 1

As depicted in Figure 1, the Current Control Section 18 converts inputted Id*, Iq* and Θ values into the outputted three phase current Iu*, Iv* and Iw* values. In his declaration, Dr. Blank identified a set of equations that could be used by Kusaka's Current Control Section 18.

> 27. Similarly, a typical transform from the d-q frame of reference to the abc (uvw) frame of reference is shown below:
>
> $$Ia = Id \cos \Theta - Iq \sin \Theta$$
>
> $$Ib = Id \cos (\Theta - 2\pi/3) - Iq \sin (\Theta - 2\pi/3)$$

$$Ic = Id \cos(\Theta + 2\pi/3) - Iq \sin(\Theta + 2\pi/3)$$

See Appx1092-1093 at ¶¶26-27. In its Patent Owner Response, Appellant admitted that this set of equations constitutes "a ***standard form*** of transformation from the rotating frame of reference to the stationary frame…." Appx0325 (emphasis added); see also Appx0019 (quoting same).

Here, Dr. Blank's "standard form of transformation" is within the scope of claim 12 because for each of the Ia, Ib and Ic equations reproduced above, *both* Id and Iq appear in each equation. See Appx1093 at ¶27; Appx0019-0020. During the Oral Hearing, Appellant said to the Board that there is no evidence of any transformation that does not include both Iq and Id.

> JUDGE BOUCHER: I just want to verify, though, that Dr. Blank has given no example in which Ia, b and c involve only one of Iq and Id, that in example C says ***they all involve some component of Iq and Id. Is that accurate***?
>
> MR. BROWN: Yes. Yes, that's accurate.

Appx0423 at ln. 9-13 (emphasis added). That is, every other possible form of the transformation would fall within the Board's construction of "combining" because *both* Iq and Id would appear in each equation.

This evidence establishes that no matter what set of equations is used by the Current Control Section 18 to convert the inputted Id*, Iq* and Θ values into the outputted set of three phase current Iu*, Iv* and Iw* values in the stationary frame, that set of equations would necessarily be "combining" the Id* and Iq* values because there are no equations that use Id* only or Iq* only to generate the Iu*, Iv* and Iw* values. See *In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986) ("Under the principles of inherency, if a structure in the prior art necessarily functions in accordance with the limitations of a process or method claim of an application, the claim is anticipated.").

Appellant argues that claim 21 cannot be found to be anticipated by Kusaka under the principles of inherency because the Board found that claim 21 was not anticipated by Walters. See Appellant's Br. 40-46. This argument must fail for at least one of three reasons.

First, neither Appellant nor Appellees ever told the Board that Kusaka and Walters presented the same factual issues with respect to the anticipation of claim 21. Indeed, if that were the case, the Board would have denied institution on Kusaka or Walters for being redundant of the other. Cf. *Shaw Indus. Group, Inc. v. Automated Creel Sys., Inc.*, 817 F.3d 1293, 1298-300 (Fed. Cir. 2016). More to the point, Appellant never argued to the Board that Kusaka cannot anticipate claim 21 if Walters is not found to also anticipate claim 21. See Appx0318-0329;

Appx0412-0435 at Appx0413, ln. 4-6 ("we say it is not anticipated by either of Kusaka or Walters."). This Court should not consider such new arguments raised for the first time on appeal. See *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997).

Second, Appellant's expert presented the set of equations to identify the transformation being performed by Kusaka's Current Control Section 18 only, and not in connection with Walters. See Appx1089-1096 at ¶¶24-30. The factual record before the Board for Kusaka differs from that for Walters. See Appx0017-0024.

Third, the yellow-highlighted annotated box that Appellant placed on Figure 3 of Walters (see Appellant's Br. 25) cannot be correlated with Kusaka's Current Control Section 18 because their outputs are different. The output of Kusaka's Current Control Section 18 are three-phase ***current*** demands denoted Iu*, Iv*, and Iw* in the stationary frame of reference. See Appx0578 at col. 11, ln. 66 - col. 12, ln. 21. Contrary to what Appellant told this Court, the output of Walters' PWM Inverter Controller 140 (which is the output of Appellant's yellow-highlighted box) is not "three phase ***currents*** -- A, B, and C in Walters" (see Appellant's Br. 44), but rather are ***voltage*** signals in Walters. See Appx0596 at col. 8, ln. 18-41; Appx1008 at ln. 8 - Appx1011 at ln. 10; Appx0328 ("then back transformation to the stationary frame of reference occurs based upon the Vq and

Vd values."); Appx0023 ("to obtain voltages Vq* and Vd* that are then back-transformed."). In Walters, the voltages in the rotating frame of reference, Vq* and Vd*, may well be combined at Walters' Voltage Limiter And Decoupler 134, but the Board found that the currents Iq* and Id* are not combined before Iq* is individually transformed to Vq* by PI current regulator 130 and Id* is individually transformed to Vd* by PI current regulator 132. See Appx0023. Claim 12 requires the current demands be combined, not the voltage demands.

## CONCLUSION

For all of the foregoing reasons, the final judgment of the Board that claim 21 of the '895 patent is invalid under 35 U.S.C. §102(b) should be affirmed.

Respectfully submitted,

Dated: August 23, 2016

***/s/ Steven F. Meyer***
Steven F. Meyer, Esq.
LOCKE LORD LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281

*Attorneys for Appellees Zhongshan Broad Ocean Motor Co., Broad Ocean Motor, LLC and Broad Ocean Technologies, LLC*

# CERTIFICATE OF SERVICE

I, the undersigned, being duly sworn according to law and being over the age of 18, upon my oath depose and say that on August 23, 2016, I hereby certify that a true and correct copy of the foregoing **CORRECTED BRIEF FOR APPELLEES** was served upon the following counsel of record via electronic CM/ECF filing and e-mail, as follows.

Scott R. Brown
Matthew B. Walters
Hovey Williams LLP
10801 Mastin Boulevard, Suite 1000
Overland Park, Kansas 66210
Phone: (913) 647-9050
Fax: (913) 647-9057

*Counsel for Appellant Nidec Motor Corporation*

Dated: August 23, 2016

***/s/ Steven F. Meyer***

Steven F. Meyer, Esq.
LOCKE LORD LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281

*Attorneys for Appellees Zhongshan Broad Ocean Motor Co., Broad Ocean Motor, LLC and Broad Ocean Technologies, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). I certify that according to the word-processing system used in preparing it, the foregoing **CORRECTED BRIEF FOR APPELLEES** contains 12,039 words, excluding those portions of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii), and therefore complies with the type-volume limitation set forth in Fed.R.App.P 28.1(e)(2)(B)(i).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated: August 23, 2016

***/s/ Steven F. Meyer***

Steven F. Meyer, Esq.
LOCKE LORD LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281

*Attorneys for Appellees Zhongshan Broad Ocean Motor Co., Broad Ocean Motor, LLC and Broad Ocean Technologies, LLC*